Richard J. ETTER, Plaintiff–Appellant,

v.

J. PEASE CONSTRUCTION COMPANY, INCORPORATED; J. Pease Construction Company, Incorporated, Profit Sharing Trust; Jack Pease; et al., Defendants–Appellees.

No. 90–2780.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 11, 1991.

Decided May 13, 1992.

Bernard M. Baum, Alan H. Auerbach (argued), Baum & Sigman, Chicago, Ill., for plaintiff-appellant.

Irving M. Geslewitz (argued), William Anspach, Karen K. Litscher, Much, Shelist, Freed, Denenberg, Ament & Eiger, Chicago, Ill., Louis W. Brydges, Jr., Brydges, Riseborough, Morris, Franke & Miller, Waukegan, Ill., for defendants-appellees J. Pease Const. Co., Inc., J. Pease Const. Co., Inc. Profit Sharing Trust, Jack Pease, Sharon Dust, Marvin Miller, Timothy F. Miller and Troy Miller, all individually and as Trustees of the J. Pease Construction Company, Incorporated Profit Sharing Trust.

Before WOOD, Jr.,* FLAUM, and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Richard Etter, the plaintiff-appellant, was hired by J. Pease Construction Co., Inc., ("Company") a land and site developer, in May 1987 and became a participant in the Company's Profit Sharing Trust ("Plan") December 31, 1988, retroactive to January 1, 1988. He quit the Company in April 1989, at which time his calculated share in the Plan was $3,062.11, comprising $2,383.94 in Company contributions and $678.17 in earnings.[1] A few months later he sued the Company, its president, Jack Pease, the Plan, and the Plan's trustees, including Pease: collectively, the defendants-appellees. He raised several claims under the Employee Retirement Income Security Act ("ERISA"): 29 U.S.C. §§ 1001 *et seq.* Relevant here are claims that the trustees engaged in two prohibited transactions and breached their fiduciary duty to diversify. He also claimed he had not been paid for some overtime work and had been underpaid, in cash, for other overtime

work, both violations of the Fair Labor Standards Act: 29 U.S.C. §§ 201 *et seq.* After a bench trial the district court found for the defendants on all counts and set forth its findings of fact and conclusions of law.

The Plan was adopted April 1984, effective July 1, 1983, to replace a union pension fund after Company employees voted to terminate Local 150 of the Operating Engineers Union as their bargaining representative. All six of the Company's employees at that time were designated trustees; subsequently, each employee who participated in the Plan for five years would become a trustee; and each trustee could cast one vote for each year of participation in the Plan. The Plan is unusual in that many, potentially all, of the benefitted employees are also trustees, managing and investing mostly their own money.

On December 30, 1985, the Plan loaned $24,000 to James Tonyan, a 10-year business acquaintance of Pease and a partner with him in three property developments. The loan was at 12% interest, a rate higher than the then-current bank rates, was secured by a mortgage on Tonyan's residence, a property worth more than $24,000, and was fully repaid December 10, 1987. At trial Etter challenged the propriety of this loan because it came on the heels of a $25,000 loan, 13 days earlier, by Tonyan to Pease, which itself came but 7 days after Pease and Tonyan, as business partners, purchased a parcel of property, Spruce Lake. Tonyan and Pease each paid $20,000 and signed a $100,000 note and mortgage to purchase the undeveloped acreage from Tonyan's recently widowed aunt. Although it was never shown that the Plan's money was improperly invested in property in which trustee Pease had a personal stake, the district court found the loan was a prohibited transaction per se. This is because it was to a business partner of a plan trustee; thus, it was to a party in interest. 29 U.S.C. §§ 1002(14)(I),

---

* Judge Wood, Jr. assumed senior status on January 16, 1992, which was after oral argument in this case.

1. A check for the total amount was issued to Etter on June 29, 1989, but as of oral argument, September 11, 1991, he had not taken possession of it.

1106(a)(1)(B). The district court also found that Etter had not established a basis for relief because the Plan had suffered no loss or other injury and no fiduciary had profited from the loan.

On December 10, 1987, the same day Tonyan repaid his loan and shortly after the Plan cashed-in an account with E.F. Hutton,[2] it invested $112,850 in a local property venture known as Glacier Ponds. This investment virtually destroyed any diversity the Plan had because its net assets at the time were $127,993.43. Pease and another Plan trustee, Marvin Miller, were partners with the Plan in the Glacier Ponds venture. Pease personally contributed 56% of the purchase price, Miller 7%, and the Plan 37%. Pease and the other trustees, although not "sophisticated" investors, were experienced in real estate and knew the local market and development potential in the county. All trustees visited the parcel personally, inquired about an adjacent golf course that was being constructed by a reliable developer, investigated the possibility of annexation by the Village of Woodstock, and reviewed both an aerial photograph of the area and relevant floodplain maps. The trustees also considered several other properties before deciding to invest in Glacier Ponds. Subsequently, the Company performed extensive site improvements on the property at no charge to the Plan. Eighteen months after purchasing Glacier Ponds for $520,206, the Plan, Pease, and Miller sold their interests for a total of $910,000. The Plan realized a profit of $109,567.68, a 97% return on its investment over the 18–month period. The district court found the Glacier Ponds investment was not a prohibited transaction and that there was no breach of the duty to diversify because under the circumstances it was prudent not to do so.

Etter appeals the above findings of fact and conclusions of law as well as the determination that the Company did not owe him overtime pay. Appellees in turn request sanctions—their costs and attorney's fees—under Fed.R.App.P. 38. The issues raised at trial are all federal questions over which the federal courts have jurisdiction. We have jurisdiction on appeal of the district court's final order. 28 U.S.C. § 1291. For the reasons given below we affirm but deny sanctions.

Neither party addresses what constitutes the appropriate standard or standards for reviewing a district court's findings of fact or conclusions of law—a situation we hope has been remedied by our recent adoption of Circuit Rule 28(k), effective February 1, 1992. Two standards are uncontroverted. First, a district court's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous...." Fed.R.Civ.P. 52(a). Second, where the district court has decided pure questions of law, now including questions of resident-state law, review is *de novo. Salve Regina College v. Russell,* — U.S. —, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). In between lies the somewhat troublesome and unsettled milieu of mixed legal and factual issues. *See Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 110 S.Ct. 2447, 2458–59, 110 L.Ed.2d 359 (1990). As is the case here, "deferential review of mixed questions of law and fact is warranted when it appears that the district court is better positioned than the appellate court to decide the issue in question or that probing appellate scrutiny will not contribute to the clarity of legal doctrine." *Salve Regina College,* 111 S.Ct. at 1222 (quotation marks and citations omitted). We need not decide how deferential that review should be because the district court's judgment on the mixed issues raised passes appellate review even under a standard less deferential than clearly erroneous. *Contrast Leigh v. Engle,* 727 F.2d 113, 124 (7th Cir.1984) (*"Leigh I"*) (review is less deferential), *with David Berg and Co. v. Gatto International Trading Co.,* 884 F.2d 306, 309 (7th Cir. 1989) (clearly erroneous).

■ First, Etter asks us to reverse the district court's denial of relief regarding

---

**2.** The Plan received approximately $30,000 from the account, having lost roughly $16,000 during the previous six months.

the Plan's loan to Tonyan. He argues the Plan is entitled to some sort of remedy, that the court *"must* impose a remedy," because it found the loan was a prohibited transaction. Our case law is otherwise.

In *Leigh v. Engle,* 858 F.2d 361 (7th Cir.1988), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 833 (1989) (*"Leigh II"*), we affirmed the district court's awarding relief for only one of three prohibited transactions. All three transactions consisted of the administrators' using employees' trust funds to purchase takeover stocks in which the administrators had a personal stake: the investment decisions were personally motivated without "adequate provision for the trust's best interests." *Id.* at 364. Collectively, the prohibited transactions greatly benefitted the trust, garnering "a whopping 72 percent return over a relatively brief time span." *Id.* at 363. Only one of the three prohibited transactions was a poor but still profitable performer. It returned a four percent profit in one year, a return less than "from a prudent alternative investment." *Id.* The plaintiffs obtained relief only for the loss of profit caused by this last transaction.

The lesson of *Leigh II* is clear: the fact that a transaction is prohibited under ERISA does not necessarily mandate a remedy, although it is a very dangerous area for trustees to explore, let alone attempt to exploit. Rather, the decision to impose a remedy lies within the court's discretion and should be "in tune with the case's realities." *Id.* at 368 (citing *Patton v. Mid–Continent Systems, Inc.,* 841 F.2d 742, 748 (7th Cir.1988)).

■ Here, the district court found that "[g]iven the rate of return and the value of the collateral pledged, the Tonyan loan was an objectively prudent and reasonable transaction by the trustees." The court went on to conclude that "Etter has not shown any loss or injury to the plan or profit to a fiduciary resulting from the Tonyan loan." Etter does not dispute these findings. Neither does he claim the loan was less profitable for the Plan than a prudent, alternative investment. Accord-

ingly, we hold the district court did not abuse its discretion in denying Etter relief and that its corresponding conclusion of law passes muster.

Second, Etter challenges the Plan's investment in the Glacier Ponds venture on two fronts. He argues the investment itself was a prohibited transaction and that the trustees breached their fiduciary duty to diversify because they invested so heavily in the Glacier Ponds venture. He, therefore, asks us to reverse the district court's conclusions of law that the transaction was not prohibited and that the Plan's failure to diversify was prudent under the circumstances.

■ Recalling that prohibited transactions do not per se mandate a remedy, we may dispose of Etter's challenge accordingly. The Plan's 18–month investment in Glacier Ponds earned it a profit of $109,-567.68 on an investment of $112,850 for an annual return of just under 65%. The Plan obviously did not suffer a loss, and Etter has not identified a more profitable, prudent, alternative investment. Absent a showing of injury to the Plan, the remedy of damages in this case is not appropriate. Moreover, the Plan is no longer a participant in that investment; consequently, the equitable remedy of divestment is not possible. Also, Etter has sought disgorgement of profits, a remedy not unlike unjust enrichment in that it may be available absent a monetary injury to the Plan. The plaintiffs in *Leigh I* and again in *Leigh II* sought disgorgement too but were rebuffed; their argument was characterized as reaching too far, because it ignored "the limiting [statutory] words, 'made through use of assets of the plan.'" *Leigh I,* 727 F.2d at 137 (quoting 29 U.S.C. § 1009(a)); *see also Leigh II,* 858 F.2d at 366. The district court found that Etter had "failed to show by a preponderance of the evidence that Pease engaged in self-dealing or that he transferred plan assets for his own personal interest." There is no determination that Pease or any other Plan fiduciary profited "through use of assets of the plan." Like the plaintiffs in *Leigh I* and *Leigh II,* Etter asks "for the moon, a prop-

**1010**

osition we firmly rejected in *Leigh I.*" *Leigh II,* 858 F.2d at 368.

■ Thus, even were the investment a prohibited transaction or a breach of the fiduciary duty to diversify, we cannot see how, under the circumstances of this case, the Plan would be entitled to the remedies sought. This is not to say a plan must suffer some sort of injury for a court to find a transaction prohibited or otherwise impermissible. The three transactions in *Leigh II* were prohibited and so denominated by the court, but only one invoked a remedy. Appellees, however, have not raised unavailability of remedy as an issue, and we need not rely on it.

■ Etter claims the Plan's investment in Glacier Ponds constituted a use of the Plan's assets for the benefit of a party in interest and, thus, is prohibited by 29 U.S.C. § 1106(a)(1)(D).³ He points out that Pease and Marvin Miller were both plan trustees and personal investors in the Glacier Ponds venture; therefore, he concludes they were parties in interest. In particular, (1) Pease and Miller personally invested 56% and 7%, respectively, in the Glacier Ponds venture, (2) the Plan invested 37% ($112,850) in the venture, (3) the Plan, Pease, and Miller also jointly and severally guaranteed a $260,000 note and mortgage on the property, (4) Pease had sufficient personal assets to purchase the Glacier Ponds property on his own, and (5) the Plan's net assets at the time were not sufficient, being a few dollars under $128,-000. Etter argues that Pease and Miller benefitted from the Plan's investment in that they secured various tax advantages while not risking as much of their personal assets. Conversely, appellees argue, as the district court found, that by contributing

less than 100% of the purchase price Pease and Miller enabled the Plan to take advantage of a valuable opportunity.

These two views of the evidence, as different as they may be, are both permissible, and the district court's account is plausible. Therefore, the finding of the district court "cannot be clearly erroneous." *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

■ Etter's other challenge to the Glacier Ponds investment is that it virtually eliminated diversity in the Plan's portfolio and, thus, breached the trustees' fiduciary duty to diversify. This challenge arises under § 1104, which states, in pertinent part:

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries ... (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so....

29 U.S.C. § 1104(a)(1)(C). Based on the specific wording of § 1104(a)(1)(C) and the accompanying House Conference Report, courts have found this section requires a burdenshifting analysis. *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 636 (W.D.Wis.1979); *Marshall v. Glass/Metal Ass'n and Glaziers and Glassworkers Pension Plan,* 507 F.Supp. 378, 384 (D.Haw.1980). Accordingly, a plaintiff must initially show a failure to diversify. If this is done, the burden shifts to the defendant to show the investment is or was, nonetheless, prudent under the circumstances.⁴

---

**3.** (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect ... (D) transfer to or use by or for the benefit of, a party in interest, of any assets of the plan....
  29 U.S.C. § 1106(a)(1)(D).

**4.** Breach of the fiduciary duty to diversify has been found, for example, in *GIW Industries, Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc.,* 895 F.2d 729 (11th Cir.1990) (fund containing 70%

30–year U.S. Treasury bonds not diversified in light of cash-flow requirements which investor did not adequately investigate); *Brock v. Citizens Bank of Clovis,* 841 F.2d 344 (10th Cir.), *cert. denied,* 488 U.S. 829, 109 S.Ct. 82, 102 L.Ed.2d 59 (1988) (duty-to-diversify-unless-prudent breached where fund had invested 65% or 85% of its assets in commercial real-estate first mortgages in and around Clovis); *Marshall v. Glass/Metal Association and Glaziers and Glassworkers Pension Plan,* 507 F.Supp. 378, 381, 384

Here, the court did not state that the Glacier Ponds investment constituted a failure to diversify, but it must have found that the investment did, because the court did determine the prudence of the investment. Etter argues the court, in making its determination, did not give sufficient weight to the testimony of his expert witness, David Kudish, and, thus, erred in finding the investment was prudent under the circumstances.

It is recognized that the standard for reviewing a challenge to a court's weighing of evidence or determination of witnesses' credibility is abuse of discretion. *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1268–69 (7th Cir.1991). "The [district court] has the function of finding the facts, weighing the evidence, and choosing from among conflicting factual inferences and conclusions those which [it] considers most reasonable...." *Sun Life Assurance Co. of Canada v. Stacks*, 187 F.2d 17, 20 (7th Cir.1951). Accordingly, "the relevant question is not how the reviewing judges would have ruled if they had been considering the case in the first place, but rather whether *any* reasonable person could agree with the district court." *Geitz v. Lindsey*, 893 F.2d 148, 150 (7th Cir.1990) (internal quotation marks and citations omitted; emphasis in *Geitz*).

The court listened to Etter's expert, David Kudish, acknowledged his credentials as a consultant on employee benefits and fiduciary investments, and found him "a knowledgeable and persuasive witness." The court found, however, that the analysis Kudish relied upon and, thus, his testimony were "of limited probative value under the unique factual circumstances presented...." Kudish had relied on a published analysis of 412 plans, only six of which had assets under $200,000 (recall the plan here contained a few dollars less than $128,000 at the time), and of these plans, only three had diversified their investments. The court also found that while the trustees were not "sophisticated investors," Kudish had not adequately considered their knowledge and experience in real estate, their careful research into the Glacier Ponds venture, their examination of the property itself and its geographic and demographic context, and Pease's years of successful experience in the local real-estate market.

Concomitantly, the court found Pease was a successful, experienced, real-estate investor and developer and that the other trustees knew and understood the local real-estate market. The court also found the trustees had responsibly investigated the Glacier Ponds property, as well as nearby property conditions and development, and had considered alternative real-estate investments. Accordingly, the court concluded it was prudent for the trustees "not to diversify plan funds at the time of the Glacier Ponds investment."

The district court's analysis of these particular circumstances is sound, and we cannot find that the court abused its discretion in weighing the evidence before it. Its corresponding findings of fact are plausible and, accordingly, not clearly erroneous, and its corresponding conclusions of law do not merit reversal.

Lastly, Etter asks us to reverse the court's finding that he "failed to show by a preponderance of credible evidence that he worked overtime or that the company owes him overtime pay." Etter, his brother Donald, Wayne Zembal, and Michael Curelo, all of whom are former employees, testified they had worked overtime and been paid for it in cash but that the payments were on a straight-time basis and not indicated on their payroll cards.[5] Tr. at 217, 12–13,

(D.Haw.1980) (a proposed, $750,001, 18–month loan at 25% interest to finance a single, speculative, real estate venture constituted 23% of fund assets and breached duty to diversify, considering special risks of the venture included the previous failure of the project, one participant being in bankruptcy, and the trustees' inexperience). On the other hand, see *Sandoval v. Simmons*, 622 F.Supp. 1174, 1199, 1208 (C.D.Ill. 1985) (no breach of duty to diversify found where 50% of account assets were contemporaneously in four stocks, containing, respectively, slightly less than 19%, 14%, 11% and 7% of the account's assets; breach of other fiduciary duties found).

5. Had this occurred, there would be numerous, potential consequences. Not only would the company have violated the Fair Labor Standards Act, 29 U.S.C. § 207(a)(2), as Etter

474–75, 608. On the other hand, Pease testified Etter had not worked overtime, the Company's employees were paid by check, and no employee received cash except for Christmas and other bonuses Pease paid out of his own pocket.

■ We review the district court's determination of this evidentiary conflict like all others, for abuse of discretion. *Daniels*, 937 F.2d at 1268–69. This evidentiary conflict was a "swearing contest"; thus, "the trial judge's (or jury's) choice of whom to believe is conclusive on the appellate court unless the judge credits *exceedingly* improbable testimony...." *United States v. Cardona–Rivera*, 904 F.2d 1149, 1152 (7th Cir.1990) (emphasis in original). The court had no evidence on this issue other than the witnesses' testimony, which presented two permissible but irreconcilable views. The court stated it observed the witnesses and evaluated their demeanor and motives. Accordingly, we cannot say the court abused its discretion in finding Etter's testimony and that of his witnesses was not credible. Consequently, the district court's corresponding findings of fact· and conclusions of law are plausible and, therefore, are neither clearly erroneous nor otherwise infirm.

## SANCTIONS

■ Appellees ask us to impose sanctions under Fed.R.App.P. 38 by awarding attorney's fees and costs in defending this appeal. Determining to award Rule 38 sanctions is a two-step process. First, we must determine if the appeal is frivolous; second, we must determine if sanctions are appropriate. *Mays v. Chicago Sun–Times*, 865 F.2d 134, 138 (7th Cir.), *cert. denied*, 493 U.S. 900, 110 S.Ct. 259, 107 L.Ed.2d 209 (1989). An appeal is frivolous where "the

result is foreordained by the lack of substance to the appellant's arguments." *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 938 (7th Cir.1989) (en banc).

■ Appellees point out that Etter, who has "little more than a $3,000 vested participant account balance," has little prospect of gaining much more were he victorious.[6] They also note Etter demonstrated little knowledge about the nature of the suit at trial and that he attended only one of the three days of trial. They assert the suit was motivated by animus on the part of Local 150 of the Operating Engineers Union with whom there had been continuing strife since the Company's employees voted to terminate Local 150 as their bargaining representative. Additionally, Etter did not formally inquire about the Plan until he left the Company, joined and secured jobs through Local 150, and secured representation by its attorney.

Appellees do not argue Etter either deliberately misstated or ignored controlling authority; neither do they argue Etter ignored or deliberately misstated the appropriate standards of review. *See, for example, Tomczyk v. Blue Cross & Blue Shield United of Wisconsin*, 951 F.2d 771, 779 (7th Cir.1991); *Greening v. Moran*, 953 F.2d 301, 306–07 (7th Cir.1992) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 2462, 110 L.Ed.2d 359 (1990)). Neither do they present a convincing argument that the appeal was destined to fail because of a lack of substance in the appellant's arguments regardless of what may have motivated Etter to bring this action. Appellees have argued for appellate sanctions mostly on the basis of trial and pre-trial acts, but these are acts

charged, but also the company and, possibly, one or more of its employees might well have violated provisions of the Internal Revenue Code. 26 U.S.C. §§ 1 *et seq.* While not wishing to suggest either probative value or admissibility, we have searched the record, including the list of plaintiff's expected exhibits in the final pre-trial order, and find no federal or state income-tax return for any former employee who testified to having been paid in cash for overtime work.

Conversely, if any witness testified falsely, there could be other potential consequences. *See, e.g.*, 18 U.S.C. § 1621.

6. It is of little import that Etter might gain little monetarily were he to triumph, for the size of an award is not necessarily the gauge of a plaintiff's victory. *Ustrak v. Fairman*, 851 F.2d 983, 989 (7th Cir.1988).

which lie within the purview of Fed. R.Civ.P. 11, not Fed.R.App.P. 38. Furthermore, appellees scantily note the availability of attorney's fees under 28 U.S.C. § 1927 (stating only, "Plaintiff and his counsel should be sanctioned under Fed. R.App.P. 38 and/or 28 U.S.C. § 1927.") but do not make that argument, and they totally ignored the opportunity granted by ERISA itself for parties to recoup fees and costs. 29 U.S.C. § 1132(g)(1). Accordingly, we deny the request for sanctions.

AFFIRMED, SANCTIONS DENIED.