# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

―――――――

No. 96-2256

―――――――

Melody Ann Felber; Estate of    *
William Marion Donelson,    *
   *
   *
     Plaintiffs - Appellees,    *
   *
     v.    *   Appeal from the United States
   *   District Court for the
Estate of Robert J. Regan;    *   District of Minnesota.
Profit Sharing Plan of Osseo-    *
Brooklyn School Bus Company;    *
Osseo-Brooklyn School Bus    *
Company,    *
   *
     Defendants - Appellants.    *

―――――――

Submitted: February 14, 1997

Filed: July 1, 1997

―――――――

Before MAGILL, BEAM, and LOKEN, Circuit Judges.

―――――――

LOKEN, Circuit Judge.

A Department of Labor investigation concluded that Robert Regan, trustee of the Osseo-Brooklyn School Bus Company Profit Sharing Plan ("the Plan"), had engaged in prohibited and imprudent transactions that violated his fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq*. After the Department acquiesced in voluntary compliance efforts, including appointment of a new, independent trustee, certain Plan beneficiaries commenced this private action against Regan and the Bus Company seeking compensatory relief on behalf of the Plan.

When Regan died before trial, his estate was substituted as a party defendant. After the bench trial, the district court[1] concluded that Regan twice breached fiduciary duties as trustee and awarded $287,269.27 to the Plan and $146,750 to plaintiffs for their attorneys' fees. Defendants appeal, challenging only the relief awarded. We affirm.

## I. The Relief Afforded to the Plan.

ERISA imposes exacting duties on the fiduciaries who control employee benefit plans to protect the interests of plan participants and beneficiaries. In investing plan assets, for example, ERISA fiduciaries must act solely in the interest of plan beneficiaries and "with the care, skill, prudence, and diligence [of] a prudent man acting in a like capacity and familiar with such matters." 29 U.S.C. § 1104(a)(1)(B). In addition, fiduciaries must avoid engaging in prohibited transactions, such as self-dealing. See 29 U.S.C. § 1106. When these duties are breached, 29 U.S.C. § 1109(a) provides that the fiduciary "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." The principal issue on this appeal is whether the district court correctly applied § 1109(a) to two transactions in which Regan improperly invested Plan assets.

---

[1]The HONORABLE WARREN K. URBOM, United States District Judge for the District of Nebraska, sitting by designation.

## A. The School District Transaction.

In November 1988, Regan bought a school bus terminal for $820,000 at a bankruptcy auction, planning to resell the property to Independent School District #196 (the "School District"). After financing the initial purchase with an $820,000 "bridge loan" from First Bank Robbinsdale ("First Bank"), Regan began negotiating a lease/purchase agreement with the School District and long term financing with First Bank. In January 1989, First Bank offered Regan a long-term $820,000 loan, bearing interest at 11.0% the first year and at a floating rate thereafter, and secured by a mortgage on the terminal property, a corporate guaranty from the Bus Company, a pledge of $200,000 of certificates of deposit owned by Regan, and assignment of the School District's lease payments.

In April 1989, Regan and the School District entered into a lease/purchase agreement. The School District leased the terminal for $17,969 per month for the fifty months commencing May 1,1989, and was granted an option to buy the property for $594,292 at the end of the lease. With this commitment in place, Regan turned down First Bank's permanent loan offer and obtained his financing from the Plan. On May 1, 1989, he caused the Plan to repay the $820,000 bridge loan. No document evidenced this $820,000 "loan." During each month of the lease, Regan received the $17,969 rent payment from the School District. For the first thirty eight months, he remitted $9,969 to the Plan, keeping $8,000 per month as his profit in the transaction. He remitted all of the last twelve rental payments to the Plan. When the School District exercised its option to purchase, the Plan received the full $594,292 purchase price. During the fifty-month lease, Regan held unencumbered title to the terminal and made a gross profit of $304,000 ($8,000 per

3

month for thirty-eight months).  The Plan earned 11.75% annual interest, and its $820,000 loan was repaid in full.

The district court concluded that this self-dealing between Regan and the Plan breached Regan's fiduciary duties as defined in ERISA, specifically, 29 U.S.C. §§ 1104(a)(1)(B) and 1106(b)(1).  Defendants do not challenge that conclusion on appeal, and rightly so.  Even if Regan intended to benefit the Plan, ERISA flatly "prohibits transactions in which the potential for misuse of plan assets is particularly great."  Leigh v. Engle, 727 F.2d 113, 123 (7th Cir. 1984).  Though Regan invested Plan assets in a "loan" that earned 11.75% interest -- much better than the 4%-6% return then being earned on the Plan's investments -- he did not protect the Plan, as an independent trustee surely would have, by documenting that the Plan was a lender, not an investor, and by obtaining adequate security for the Plan's loan, such as the collateral demanded in First Bank's proposal.  Regan evidently knew his self-dealing was suspect because, by reporting that the Plan had made a secured loan *to the School District*, he concealed the true nature of the transaction from Plan beneficiaries, the Plan's auditors, and the Internal Revenue Service.

Thus, the issue here is remedy.  Because the Plan suffered no loss, the question is whether Regan (now his estate) must disgorge to the Plan "profits . . . made through use of assets of the plan by the fiduciary."  29 U.S.C. § 1109(a). When a fiduciary has invested his own assets and made use of plan assets in a prohibited transaction, "section 1109 only allows recovery [for the plan] where there is a causal connection between the use of the plan's assets and the profits made by fiduciaries on the investment of their own assets."  Leigh v. Engle, 858 F.2d 361, 366 (7th Cir.

4

1988), <u>cert. denied</u>, 489 U.S. 1078 (1989).[2]  Defendants argue that Regan did not profit by "using" Plan assets because his profit was locked in when he reached agreement with the School District in April 1989, and because he could have financed the lease/purchase with his own liquid assets, or with a long-term loan from First Bank.  The district court rejected that argument and awarded the Plan $275,652.27, Regan's entire net profit from the transaction including prejudgment interest.

On appeal, defendants renew their argument that Regan's entrepreneurial profit was fixed once he had negotiated terms with both the School District and First Bank, before the Plan became involved.  The most obvious problem with this argument is that Regan obtained financing from the Plan on different terms than First Bank had offered.  Appellants focus only on the fact that the initial interest rate offered by First Bank would have been less than the 11.75% paid to the Plan.  But First Bank financing would have involved not only the risk of a floating interest rate, but also extensive collateral requirements -- a first mortgage on the terminal property, assignment of the School District's lease payments, a guaranty from the Bus Company, and a continuing pledge by Regan of $200,000 of highly liquid assets.  There is no evidence in the record that explains the financial cost of these terms to Regan as borrower at that time.  Had Regan lived to testify at trial, he might have convinced the finder of fact that, despite his efforts to cover up the Plan's involvement, he really did transfer all of the "lender's profit" from First Bank to the Plan, deriving no personal profit from his unlawful use of Plan assets.  But on

---

[2]<u>See also</u> <u>Etter v. J. Pease Constr. Co.</u>, 963 F.2d 1005, 1009 (7th Cir. 1992) ("the fact that a transaction is prohibited under ERISA does not necessarily mandate a remedy, although it is a very dangerous area for trustees to explore, let alone attempt to exploit").

this record, the district court was clearly justified in drawing a contrary conclusion -- that Regan surreptitiously made use of the Plan's $820,000 at least in part to improve his own financial circumstances and thereby increase his profit from the purchase and resale of the terminal property.

That conclusion resolves this part of the case. Defendants argue only that Regan made no profit through use of the Plan's assets. They do not raise the more complex question whether Regan's *entire* profit should be attributed to his unlawful use of the Plan's assets. We do not address that question, except to remind future litigants that "once the ERISA plaintiff has proved a breach of fiduciary duty and a prima facie case of . . . ill-gotten profit to the fiduciary, the burden of persuasion shifts to the fiduciary to prove that . . . his profit was not attributable to the breach of duty." <u>Martin v. Feilen</u>, 965 F.2d 660, 671 (8th Cir. 1992), <u>cert denied</u>, 506 U.S. 1054 (1993).

## B. The Reco Loans.

In October 1985, Regan lent $200,000 of Plan assets to Reco, Inc., a competing school bus company owned beneficially by several of his nieces and nephews. This term loan was repayable in semiannual $10,000 installments, with the balance due in July 1988. It was secured by a junior mortgage on Reco's new bus terminal. Regan caused the Plan to extend this loan beyond July 1988 and to lend Reco an additional $450,000 in October 1990. Reco repeatedly missed installment payments of principal and interest over the years, but there was evidence that the Plan's loan was always fully secured. In January 1992, at Reco's request, Regan caused the Plan to reduce the interest rate on the unpaid loan balance from 11.0% to 9.5%. Reco repaid the Plan in full in January 1993.

This was not a prohibited transaction, but the district court nonetheless concluded that Regan breached his fiduciary duty of care to the Plan by acting imprudently and by not acting solely in the best interests of the Plan. See 29 U.S.C. § 1104 (a)(1)(A) and (B). Again, defendants do not contest this conclusion on appeal. Turning to the question of remedy, the district court awarded $11,617 to reimburse the Plan for the loss attributable to the 1992 interest rate reduction. Defendants argue that this was an improper remedy under § 1109(a), pointing to "uncontradicted and apparently credible" testimony by Patrick Regan, a Reco officer, and Scott Regan, Regan's son, that interest rates declined in 1991, that Reco threatened to refinance elsewhere if the Plan did not reduce its interest rate to 9.5%, and that Regan reasonably acquiesced in this demand because alternative Plan investments did not offer a return better than 9.5%. This is a plausible theory, but lacking proof that Reco had a willing alternative lender waiting in the wings, the district court found that Reco's "threat to [refinance was] an empty one." This finding is not clearly erroneous, and therefore defendants failed to satisfy their burden to rebut plaintiffs' prima facie showing of loss to the Plan.

## II. The Award of Attorney's Fees.

ERISA provides that in any action by plan participants or beneficiaries "the court in its discretion may allow a reasonable attorney's fee." 29 U.S.C. § 1132(g). In this case, plaintiffs' two law firms requested a total fee award of $222,332. The district court conducted a thorough review of the litigation, applying the factors set forth in Lawrence v. Westerhaus, 749 F.2d 494, 495-96 (8th Cir. 1984), and concluded that plaintiffs were entitled to a reasonable fee award. It then carefully analyzed the fee requests, rejecting substantial portions because they

reflected work that was excessive, duplicative, or unnecessary. The court awarded plaintiffs attorneys' fees of $146,750, payable by Regan's estate and the Bus Company. Because defendants concede the court applied the correct legal standard, we review this award for abuse of discretion. See Jacobs v. Pickands Mather & Co., 933 F.2d 652, 659 (8th Cir. 1991).

Defendants argue that the fee award is excessive because plaintiffs succeeded on only four of the thirteen claims in their complaint, because plaintiffs recovered only a fraction of the total damages they were seeking, and because it "cannot be disputed that Mr. Regan was acting in good faith," which is one of the Westerhaus factors. Although plaintiffs' excessive fee requests and questionable billing practices concern us, as they did the district court, the lawsuit has resulted in a substantial recovery for the Plan that is significantly greater than the court's fee award. After carefully reviewing the record and the district court's meticulous analysis of the fee issue, we conclude that the fees awarded were well within its considerable discretion.

The amended judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

8