T.C. Memo. 2004-260


UNITED STATES TAX COURT


JOSEPH R. ROLLINS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 598-03.                    Filed November 15, 2004.


        P caused the 401(k) plan of his wholly owned company to
lend money to three entities in which P owned minority
interests.  P's company is the sole trustee of, and the
administrator of, the 401(k) plan.  P also acted on the part
of the borrower entities in agreeing to the loans.

        1.  <u>Held</u>:  Each of the loans was a "prohibited
transaction" within the meaning of sec. 4975(c)(1)(D),
I.R.C. 1986.  P, a disqualified person, is liable for
excise taxes under sec. 4975(a) and (b), I.R.C. 1986;
amounts to be determined.

        2.  <u>Held</u>, <u>further</u>, P is liable for additions to tax
under sec. 6651(a)(1), I.R.C. 1986, for failure to file
excise tax returns; amounts to be determined.

Joseph R. Rollins, pro se.

Denise G. Dengler, for respondent.


MEMORANDUM OPINION

CHABOT, Judge: Respondent determined deficiencies in excise taxes under section 4975[1] (prohibited transactions) and additions to tax under section 6651(a)(1) (failure to file tax return) against petitioner as follows:

| Year or Taxable Period | Deficiencies | | Additions to Tax |
| --- | --- | --- | --- |
| | Sec. 4975(a) | Sec. 4975(b) | Sec. 6651(a)(1) |
| 1998 | $5,231.80 | --- | $1,307.95 |
| 1999 | 14,576.97 | --- | 3,644.24 |
| 2000 | 24,448.50 | --- | 6,112.13 |
| Period ending Oct. 9, 2002 | --- | $164,228.39 | --- |

---

[1] Unless indicated otherwise, all section and subtitle references are to sections and subtitles of the Internal Revenue Code of 1986 as in effect for the years and taxable period in issue.

After concessions by respondent,[2] the issues for decision are as follows:

(1) Whether any of petitioner's company's section 401(k) plan's loans to entities partially owned by petitioner constituted prohibited transactions within the meaning of section 4975.

(2) If any of the loans were prohibited transactions, then whether petitioner had reasonable cause for any of his failures to file excise tax returns for 1998, 1999, and 2000.

## Background

The instant case was submitted fully stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

---

[2] On brief, respondent concedes that there were "loan interest payments, which reduce both the § 4975(a)&(b) excise taxes." At another point on brief, respondent concedes that "Petitioner has established that the principal of the loans was repaid; there is still an issue whether the interest was paid." We assume that, where these concessions affect the sec. 4975(a) excise taxes, these concessions may have consequential effects on the determinations of additions to tax under sec. 6651(a)(1).

The parties have not presented any specific dispute as to the extent of these concessions, and thus the instant report does not deal with matter. Any relevant unresolved dispute will be dealt with in proceedings under Rule 155 or as may otherwise be appropriate. See Medina v. Commissioner, 112 T.C. 51 (1999).

Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.

When the petition was filed in the instant case, petitioner resided in Atlanta, Georgia.

Petitioner is a certified public accountant and a registered investment adviser; also, he holds various certifications in the area of financial planning and investment managing, including certified employee benefits specialist, certified financial planner, and charter financial consultant.

1. The Plan

Petitioner owns 100 percent of Rollins & Associates, P.C., a certified public accounting firm, hereinafter sometimes referred to as Rollins. Rollins has a section 401(k) profit-sharing plan, known as Rollins & Associates, P.C. 401(k) Profit Sharing Plan hereinafter sometimes referred to as the Plan. The Plan's predecessor dates back at least to 1985.

At all times relevant herein, the Plan was tax-qualified under section 401(a), and the Plan's underlying trust was exempt from tax under section 501(a).

Rollins has been the sole trustee under the Plan since 1985. The trustee is responsible for the following items, as well as other items listed in the Plan's governing instrument: investing, managing, and controlling the Plan's assets (subject to the direction of an investment manager if the trustee appoints one); paying benefits required under the Plan at the direction of the administrator; and maintaining records of receipts and

disbursements. The trustee has the power to invest and reinvest the Plan's assets in such securities and property, real or personal, wherever situated, as the trustee shall deem advisable.

Under the Plan, Rollins is to designate the Plan's administrator; if Rollins does not designate an administrator, then Rollins is to function as the administrator. Rollins has not designated an administrator.

Petitioner owns 100 percent of Rollins Financial Counseling, Inc., a registered investment advisory company, hereinafter sometimes referred to as Rollins Financial. In November 1993, Rollins entered into an investment advisory agreement with Rollins Financial whereby Rollins Financial was to provide financial counseling services to Rollins. The agreement provides that petitioner, as Rollins Financial's CEO, "will make all investment decisions on behalf of [Rollins] * * *. The recommendations developed by [petitioner] are based upon the professional judgment of [petitioner]".

2. The Loans

    a. Overall

As to each of the loans shown in table 1, petitioner made the decision to lend the Plan's money in the indicated amount to the indicated borrower: Jocks & Jills Charlotte, Inc., hereinafter sometimes referred to as J & J Charlotte; Eagle Bluff Golf Club, LLC, hereinafter sometimes referred to as Eagle Bluff;

or Jocks and Jills, Inc.  J & J Charlotte, Eagle Bluff, and Jocks and Jills, Inc., are hereinafter sometimes referred to collectively as the Borrowers.

### Table 1

| Loan Date | Borrower | Amount |
|---|---|---|
| May 29, 1996 | J & J Charlotte | $100,000 |
| June 7, 1996 | J & J Charlotte | 100,000 |
| June 12, 1996 | J & J Charlotte | 75,000 |
| July 8, 1996 | J & J Charlotte | 25,000 |
| Sept. 9, 1996 | J & J Charlotte | 25,000 |
| May 20, 1997 | Eagle Bluff | 50,000 |
| Sept. 2, 1998 | Jocks and Jills, Inc. | 200,000 |
| Nov. 20, 1998 | Jocks and Jills, Inc. | 50,000 |
| Dec. 31, 1998[1] | Jocks and Jills, Inc. | 25,000 |
| Jan. 26, 1999 | Jocks and Jills, Inc. | 50,000 |

[1] The parties' stipulation states that the $25,000 check is dated Nov. 20, 1998.  However, the stipulated exhibit shows that the check is dated Dec. 31, 1998, and the check processing stamps are consistent with the latter date. Our finding follows the stipulated exhibit rather than the stipulation.

### b.  J & J Charlotte

J & J Charlotte is a sports theme restaurant located in Charlotte, North Carolina.  When J & J Charlotte was incorporated, in September 1994, and on the dates shown supra in table 1, petitioner was the only member of J & J Charlotte's board of directors and was J & J Charlotte's vice president, secretary, and treasurer; on the table 1 dates petitioner also was J & J Charlotte's registered agent.

When J & J Charlotte was incorporated, petitioner owned all 10,000 shares of J & J Charlotte's subscribed stock.  By June 30, 1996, 102,000 additional shares were outstanding.  On the dates

shown <u>supra</u> in table 1, petitioner had an 8.93-percent interest in J & J Charlotte[3], and his then-wife had a 6.70-percent interest.  There were 28 other shareholders on June 30, 1996; the next greatest percentage interest was 6.25 percent.

Petitioner signed the Plan's July 8 and September 9, 1996, checks to J & J Charlotte.  (The record does not indicate who signed the checks that effectuated the first three loans shown in table 1.)  Petitioner signed all five of J & J Charlotte's promissory notes to the Plan, on behalf of J & J Charlotte.  Each of these promissory notes was a 12-percent-per-year demand note; each stated that it was secured by all the machinery and equipment at J & J Charlotte.

On January 11, 2000, petitioner paid $150,500 to the Plan as a repayment on the J & J Charlotte loans.

All of the principal of the Plan's loans to J & J Charlotte has been repaid.  See supra note 2.

c.  Eagle Bluff

Eagle Bluff was a golf club located in Chattanooga, Tennessee.  From 1994 until Eagle Bluff was sold in 2000, petitioner was Eagle Bluff's treasurer and its registered agent in Georgia.  On May 20, 1997, the Plan lent $50,000 to Eagle

---

[3] So stipulated.  However, the stipulated stock register shows that, on Aug. 28, 1996, before the date of the last loan shown on table 1, petitioner acquired 2,500 shares from another shareholder.  This raised petitioner's interest to 11.16 percent.

Bluff; at this time petitioner had a 26.8-percent interest in Eagle Bluff; his equity amounted to $983,237.45 out of a total of $3,667,212.45. There were more than 80 other partners; the next greatest percentage interest was that of a couple, who between them and their IRA, held an aggregate 8.8197-percent interest. Petitioner invested an additional $307,151.86 in Eagle Bluff between 1997 and 1998, which increased his percent interest to 31.71.

Petitioner signed the Plan's check to Eagle Bluff. Petitioner signed Eagle Bluff's promissory note to the Plan, on behalf of Eagle Bluff. The promissory note was a 12-percent-per-year demand note; the note stated that it was secured by all the property and equipment at Eagle Bluff. At the time of the loan, 12-percent interest was greater than market rate interest.

During 1999, Rollins paid a total of $3,900 of Eagle Bluff's interest obligations to the Plan, because Eagle Bluff was not able to make the payments. During November and December 1999, petitioner paid a total of $20,000, Rollins Financial paid $7,500, and Rollins paid $7,500 of Eagle Bluff's principal obligations to the Plan, because Eagle Bluff was not able to make the payments. All $35,000 of these 1999 principal payments were treated as petitioner's additional equity in Eagle Bluff. Petitioner fully intended he would receive the funds back from his equity when Eagle Bluff was sold.

All of the principal of the Plan's loan to Eagle Bluff has been repaid.  See supra note 2.

d.  Jocks and Jills

Jocks and Jills, Inc., is a corporation located in Atlanta, Georgia.  Petitioner was the secretary/treasurer of Jocks and Jills, Inc., in 1998 and 1999, and its registered agent in Georgia in 1998 and 1999.  On the dates shown supra in table 1 petitioner had a 33.165-percent interest in Jocks and Jills, Inc. There were more than 70 other partners; the next greatest percentage interest was of a partner who held 4.8809 percent.[4]

Petitioner signed the Plan's November 20, 1998, December 31, 1998, and January 26, 1999, checks effectuating the loans to Jocks and Jills, Inc.[5]  (The record does not indicate who signed the check or checks that effectuated the first loan shown supra in table 1.)  Petitioner signed Jocks and Jills, Inc.'s promissory notes to the Plan on behalf of Jocks and Jills, Inc. The first promissory note, dated September 2, 1998, was in the amount of $200,000.  On January 15, 1999, Jocks and Jills, Inc.,

_____

[4] So stipulated.  The stipulated exhibit that serves as the foundation of the stipulated conclusions lists "Partners' Allocation Percentages" for Jocks & Jills Restaurant, LLC, a separate entity from Jocks and Jills, Inc.  In the absence of an explanation by the parties, we have followed the language of the parties, even to the use of the word "partner" rather than "shareholder".

[5] The two $50,000 checks are made out to Jocks and Jills, Inc., but the $25,000 check is made out to Jocks & Jills Restaurants, LLC.  See supra note 4.

made a $25,000 partial repayment of its second loan. The second promissory note, signed on February 22, 1999, was in the amount of $100,000. (From the dates of the loans and the repayment, we gather that this promissory note was for the remaining amounts due on the second, third, and fourth loans. The record does not indicate whether promissory notes had been issued at the times the loans were made.) Each of these promissory notes was a 12-percent-per-year demand note; each stated it was secured by all machinery and equipment at Jocks and Jills, Inc.

After a series of monthly Jocks and Jills, Inc., $5,000 checks to the Plan, on January 28, 2000, petitioner paid $155,571.57 to the Plan as a repayment plus interest on the $200,000 Jocks and Jills, Inc., loan.

On December 8, 1999, Jocks and Jills, Inc., paid $100,000 to the Plan as a repayment "in full" on the February 22, 1999, promissory note. The check making this payment had petitioner's stamped signature.

All of the principal of the Plan's loans to Jocks and Jills, Inc., has been repaid. See supra note 2.

3. Tax Returns

Petitioner did not file any excise tax returns, Forms 5330, Return of Excise Taxes Related to Employee Benefit Plans, for the relevant taxable periods. The record does not indicate whether

the Plan filed any tax returns or information returns for any taxable periods.

4.  <u>U.S. Department of Labor</u>

On April 16, 2002, respondent sent a letter to the Department of Labor notifying the Department of Labor that respondent was contemplating adjusting petitioner's section 4975 tax liability.  This letter was sent pursuant to section 3003(a) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1203(a)), Pub. L. 93-406, 88 Stat. 829, 998 (ERISA '74).  On May 8, 2002, respondent sent another letter to the Department of Labor, stating that the matter was now before respondent's Appeals Office and asking for a response within 60 days.

## Discussion[6]

I.  Excise Taxes

a.  Parties' Contentions

Respondent contends that petitioner is a disqualified person with respect to the Plan in two capacities:  (a) A fiduciary of the Plan (sec. 4975(e)(2)(A)), and (b) the 100-percent owner of Rollins, the employer sponsoring the Plan (subpars.(E) and (H) of sec. 4975(e)(2)).  Respondent contends that the Plan's loans to

---

[6] Sec. 7491, relating to burden of proof, was not drawn in issue by either side.

However, for completeness, and in light of petitioner's pro se status, we note the following:  Sec. 7491(a) provides for shifting the burden of proof (if certain conditions have been satisfied) with respect to "any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B".  Sec. 7491(a)(1).  The sec. 4975 taxes involved in the instant case are imposed by subtitle D; the parties have not suggested any subtitle A or B component.  Accordingly, sec. 7491(a) cannot operate to shift the burden of proof in the instant case.  See, e.g., Jos. M. Grey Pub. Acct., P.C. v. Commissioner, 119 T.C. 121, 123, n.2 (2002), affd. 93 Fed. Appx. 473 (3d Cir. 2004).

Sec. 7491(b), relating to statistical information on unrelated taxpayers, does not apply to the instant case.

Sec. 7491(c) imposes on respondent the burden of production with respect to the additions to tax under sec. 6651(a)(1).  The parties' stipulation that--"3.  Petitioner did not file any excise tax returns, Forms 5330, Return of Excise Taxes Related to Employee Benefit Plans, for the relevant taxable periods." satisfies this obligation; petitioner still has the burden of proving that the determined additions should not be imposed. Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  But see supra note 2.  Finally, the parties' presentation of the instant case fully stipulated does not change the burden of proof.  Rule 122(b); Borchers v. Commissioner, 95 T.C. 82, 91 (1990), affd. 943 F.2d 22 (8th Cir. 1991).

entities in which petitioner had an interest were prohibited transactions because (1) The loans were transfers of the Plan's assets that benefited petitioner (sec. 4975(c)(1)(D)), and (2) the loans were dealings with the Plan's assets in petitioner's own interest (sec. 4975(c)(1)(E)).  Respondent contends that petitioner benefited from the loans in that the loans enabled the Borrowers--all entities in which petitioner owned interests--to operate without having to borrow funds at arm's length from other sources.  Respondent summarizes the contentions regarding petitioner's role as fiduciary, as follows:

> No documentation was provided of any security interest under the U.C.C. which would have protected the Plan against other creditors of these companies.  (Stip., para. 23, 38, 41, 44, 47, 50, 61, 69)  Petitioner would have had to authorize any actions the Plan took against the companies and its officers to collect its loans. Petitioner's ownership interest in these companies created a conflict of interest between the Plan and the companies, resulting in dividing his loyalties to these entities.  This conflicting interest as a disqualified person who is a fiduciary brought petitioner within the prohibition against dealing "with the income or assets of a plan in his own interest or for his own account". I.R.C. § 4975(c)(1)(E).

Petitioner maintains that, as to each of the loans: (1) The interest rate was above market interest and was paid, (2) the collateral was safe and secure and the principal was repaid, and (3) the Plan's assets were thereby diversified and thus the Plan's portfolio's risk level was "significantly lowered".[7]

---

[7] The record does not indicate (1) either the magnitude or
(continued...)

Petitioner acknowledges that he is a disqualified person with regard to the Plan because he owns Rollins, but he contends that (1) none of the Borrowers was a disqualified person, (2) none of the loans was a transaction between him and the Plan, and (3) he "did not benefit from these loans, either in income or in his own account".

We agree with respondent's conclusion as to section 4975(c)(1)(D).

Because of our concerns about how the statute should be applied to the evidence of record, our conclusion that all of the opinions relied on by both sides are fairly distinguishable, and the absence of applicable Treasury regulations,[8] we first consider the background of section 4975.

b.  Background:  Sec. 503 (I.R.C. 1954); Sec. 4941 (TRA '69)

The Internal Revenue Code of 1954, as originally enacted, provided that if a charitable organization (sec. 501(c)(3)) or a trust which is part of an employees plan (sec. 401(a)) engaged in a prohibited transaction, then the entity lost its section 501(a)

---

[7](...continued)
the nature of the Plan's other assets, or (2) either the magnitude or the timing of the Plan's obligations.

[8] We note that sec. 53.4941(d)-2(f), Private Foundation Excise Tax Regs., interprets sec. 4941(d)(1)(E), which is almost exactly the same as sec. 4975(c)(1)(D).  Neither side cites this regulation for any purpose.  Under the circumstances we do not explore in the instant opinion whether this regulation provides any insight into the meaning of sec. 4975(c)(1)(D).

exempt status. Sec. 503(a)(1).[9] "Prohibited transaction" was defined as any of certain types of transactions between the entity and certain related persons; the types of transactions involved case-by-case analyses of arm's-length standards-- determinations of reasonableness, adequacy, or preferential basis. Sec. 503(c).

In 1969, the Congress concluded that, as applied to private foundations, (1) The arm's-length standards of then-existing law required disproportionately great enforcement efforts, (2) violations of the law often resulted in disproportionately severe sanctions, and (3) at the same time, the law's standards often permitted those who controlled the private foundations to use the foundations' assets for personal noncharitable purposes without any significant sanctions being imposed on those who thus misused the private foundations. See H. Rept. 91-413 (Part 1), 4, 20-21 (1969), 1969-3 C.B 202, 214; S. Rept. 91-552, 6, 28-29 (1969), 1969-3 C.B. 426, 442-443; also see Staff of the Joint Committee on Internal Revenue Taxation, General Explanation of the Tax Reform Act of 1969 (hereinafter sometimes referred to as the TRA '69 Blue Book) 3, 30-31. The Senate Finance Committee described its conclusions as follows:

---

[9] Sec. 503 of the Internal Revenue Code of 1954 was derived from sec. 3813 of the Internal Revenue Code of 1939; that provision had been enacted in 1950.

To minimize the need to apply subjective arm's-length standards, to avoid the temptation to misuse private foundations for noncharitable purposes, to provide a more rational relationship between sanctions and improper acts, and to make it more practical to properly enforce the law, the committee has determined to generally prohibit self-dealing transactions and to provide a variety and graduation of sanctions, as described below.

The committee's decisions generally in accord with the House bill, are based on the belief that the highest fiduciary standards require that self-dealing not be engaged in, rather than that arm's-length standards be observed.

S. Rept. 91-552, 29 (1969), 1969-3 C.B. 443.  To the same effect, see H. Rept. 91-413 (Part 1), 21 (1969), 1969-3 C.B. 214; see also TRA '69 Blue Book 30-31.

As a result, in the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487 (TRA '69), the Congress removed private foundations from the old arm's-length self-dealing requirements (sec. 101(j)(7) of TRA '69) and enacted section 4941 (sec. 101(b) of TRA '69, relating to taxes on self-dealing).  See H. Rept. 91-413 (Part 1), 21 (1969), 1969-3 C.B. 214; S. Rept. 91-552, 29 (1969), 1969-3 C.B. 443; see also TRA '69 Blue Book 31.

Section 4941(d)(1) provided the following general definition of self-dealing:

SEC. 4941.  TAXES ON SELF-DEALING.

\*       \*       \*       \*       \*       \*       \*

(d)  Self-Dealing.--

(1) In general.--For purposes of this section, the term "self-dealing" means any direct or indirect--

(A) sale or exchange, or leasing, of property between a private foundation and a disqualified person;

(B) lending of money or other extension of credit between a private foundation and a disqualified person;

(C) furnishing of goods, services, or facilities between a private foundation and a disqualified person;

(D) payment of compensation (or payment or reimbursement of expenses) by a private foundation to a disqualified person;

(E) transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a private foundation; and

(F) agreement by a private foundation to make any payment of money or other property to a government official (as defined in section 4946(c)), other than an agreement to employ such individual for any period after the termination of his government service if such individual is terminating his government service within a 90-day period.

The Senate Finance Committee illustrated the application of these provisions, in pertinent part, as follows:

A self-dealing transaction may occur even though there has been no transfer of money or property between the foundation and any disqualified person. For example, a "use by, or for the benefit of, a disqualified person of the income or assets of a private foundation" may consist of securities purchases or sales by the foundation in order to manipulate the prices of the securities to the advantage of the disqualified person.

*        *        *        *        *        *        *

It has been suggested that many of those with whom a foundation "naturally" deals are, or may be, disqualified persons. However, the difficulties that prompted this legislation in many cases arise because

foundations "naturally" deal with their donors and their donors' businesses.

If a substantial donor owns an office building, the foundation should look elsewhere for its office space.  (Interim rules provided in the case of existing arrangements are discussed below.)  A recent issue (May 1969) of the American Bar Association Journal discussing an instance of an attorney purchasing assets at fair market value from an estate he was representing suggests the problems even in "fair market value" self-dealing:

> The Ethics Committee said that it is generally "improper for an attorney to purchase assets from an estate or an executor or personal representative, for whom he is acting as attorney.  Any such dealings ordinarily raise an issue as to the attorney's individual interest as opposed to the interest of the estate or personal representative whom he is representing as attorney.  While there may be situations in which after a full disclosure of all the facts and with the approval of the court, it might be proper for such purchases to be made * * * in virtually all circumstances of this kind, the lawyer should not subject himself to the temptation of using for his own advantage information which he may have personally or professionally * * *"

S. Rept. 91-552, 29, 30-31 (1969), 1969-3 C.B. 443, 444.  To the same effect, see also TRA '69 Blue Book 31, 32.

c.  <u>Sec. 4975 (ERISA '74)</u>

By 1974, the Congress reached similar conclusions about the same sorts of transactions involving employees plans.

Section 4975[10], enacted by section 2003(a) of ERISA '74,
imposes taxes on a disqualified person who participates in a

---

[10] Sec. 4975 provides, in pertinent part, as follows:

SEC. 4975. TAX ON PROHIBITED TRANSACTIONS.

  *      *      *      *      *      *      *

  (c)  Prohibited Transaction.--

    (1)  General rule.--For purposes of this
  section, the term "prohibited transaction"
  means any direct or indirect--

      (A) sale or exchange, or leasing,
    of any property between a plan and a
    disqualified person;

      (B) lending of money or other
    extension of credit between a plan
    and a disqualified person;

      (C) furnishing of goods, services,
    or facilities between a plan and a
    disqualified person;

      (D) transfer to, or use by or for
    the benefit of, a disqualified person of
    the income or assets of a plan;

      (E) act by a disqualified person who
    is a fiduciary whereby he deals with the
    income or assets of a plan in his own
    interest or for his own account; or

      (F) receipt of any consideration for
    his own personal account by any disqualified
    person who is a fiduciary from any party
    dealing with the plan in connection with a
    transaction involving the income or assets of the
    plan.

prohibited transaction between a plan and a disqualified person.[11]

The close relationship between the Congress' reaction to the private foundations problems in TRA '69 and the employees plans problems in ERISA '74 is evident in (1) the general structures of sections 4941 (private foundations) and 4975 (employees plans) and (2) the identity of many elements of the definitions of "prohibited transaction" (sec. 4975(c)(1)) and "self-dealing" (sec. 4941(d)(1)). The opening language of the definitions and many of the elements in the definitions (subpars. (A), (B), (C), and (E) of sec. 4941(d)(1) and subpars. (A), (B), (C), and (D) of sec. 4975(c)(1)) are word-for-word identical. The ERISA '74 conference joint statement of managers confirms, at numerous points, the TRA '69 private foundations origins of much of section 4975. H. Conf. Rept. 93-1280 (1974), 1974-3 C.B. 415:

---

[11] Sec. 4975(h) requires respondent to notify the Department of Labor before issuing a notice of deficiency with respect to taxes imposed by sec. 4975(a) or (b). Our findings include the parties' stipulations as to two such notifications. Sec. 4975(i) is a cross-reference to coordination procedures under sec. 3003 of ERISA. Petitioner does not contend that the notification was insufficient or that any action of the Department of Labor under ERISA secs. 406 (relating to prohibited transactions), 408 (relating to exemptions from prohibited transactions), 3003 (relating to procedures in connection with prohibited transactions), or 3004 (relating to coordination between the Treasury Department and the Labor Department) affects the instant case. See 29 U.S.C. 1106, 1108, 1203, 1204. Accordingly, we assume that all requirements as to notification of, and coordination with, the Labor Department have been complied with.

Fiduciary responsibility rules, in general

The conference substitute establishes rules governing the conduct of plan fiduciaries under the labor laws (title I) and also establishes rules governing the conduct of disqualified persons (who are generally the same people as "parties in interest" under the labor provisions) with respect to the plan under the tax laws (title II).  This division corresponds to the basic difference in focus of the two departments.  The labor law provisions apply rules and remedies similar to those under traditional trust law to govern the conduct of fiduciaries.  The tax law provisions apply an excise tax on disqualified persons who violate the new prohibited transaction rules; this is similar to the approach taken under the present rules against self-dealing that apply to private foundations.  [Id. at 295, 1974-3 C.B. 456.]

*       *       *       *       *       *       *

Prohibited transactions

In general.--The conference substitute prohibits plan fiduciaries and parties-in-interest from engaging in a number of specific transactions.  Prohibited transaction rules are included both in the labor and tax provisions of the substitute.  Under the labor provisions (title I), the fiduciary is the main focus of the prohibited transaction rules.  This corresponds to the traditional focus of trust law and of civil enforcement of fiduciary responsibilities through the courts.  On the other hand, the tax provisions (title II) focus on the disqualified person.  This corresponds to the present prohibited transaction provisions relating to private foundations.[2]

The prohibited transactions, and exceptions there-from, are nearly identical in the labor and tax provisions.  However, the labor and tax provisions differ somewhat in establishing liability for violation of prohibited transactions.  Under the labor provisions, a fiduciary will only be liable if he knew or should have known that he engaged in a prohibited

transaction.  Such a knowledge requirement is not included in the tax provisions.  This distinction

_____

[2] Generally, the substitute defines a prohibited transaction as the same type of transaction that constitutes prohibited self-dealings with respect to private foundations, with differences that are appropriate in the employee benefit area.  As with the private foundation rules, under the substitute, both direct and indirect dealings of the proscribed type are prohibited.

conforms to the distinction in present law in the private foundation provisions (where a foundation's manager generally is subject to a tax on self-dealing if he acted with knowledge, but a disqualified person is subject to tax without proof of knowledge). [Id. at 306-307, 1974-3 C.B. at 467.]

*　　*　　*　　*　　*　　*　　*

The substitute prohibits the direct or indirect transfer of any plan income or asset to or for the benefit of a party-in-interest.  It also prohibits the use of plan income or assets by or for the benefit of any party-in-interest.  As in other situations, this prohibited transaction may occur even though there has not been a transfer of money or property between the plan and a party-in-interest.  For example, securities purchases or sales by a plan to manipulate the price of the security to the advantage of a party-in-interest constitutes a use by or for the benefit of a party-in-interest of any assets of the plan.  [Id. at 308, 1974-3 C.B. at 469.]

*　　*　　*　　*　　*　　*　　*

The substitute also prohibits a fiduciary from receiving consideration for his own personal account from any party dealing with the plan in connection with the transaction involving the income or assets of the plan.  This prevents, eg., "kickbacks" to a fiduciary.

In addition, the labor provisions (but not the tax provisions) prohibit a fiduciary from acting in any transaction involving the plan on behalf of a person (or representing a party) whose interests are adverse to the interest of the plan or of its participants or beneficiaries.  This prevents a fiduciary from being put in a position where he has dual loyalties, and,

therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries. (This prohibition is not included in the tax provisions, because of the difficulty in determining an appropriate measure for an excise tax.) [Id. at 309, 1974-3 C.B. at 470.]

\* \* \* \* \* \* \*

Following present law with respect to private foundations, under the substitute where a fiduciary participates in a prohibited transaction in a capacity other than that, or in addition to that, of a fiduciary, he is to be treated as other disqualified persons and subject to tax. Otherwise, a fiduciary is not to be subject to the excise tax. [Id. at 321, 1974-3 C.B. at 482.]

After enacting ERISA '74, the Congress took a similar approach in section 4951, enacted by section 4(c)(1) of the Black Lung Benefits Revenue Act of 1977, Pub. L. 95-227, 92 Stat. 11, 18.

d. Prohibited Transactions

Each of the transactions, listed supra in table 1, was a loan. Respondent does not contend that any of the transactions fits under section 4975(c)(1)(B) ("any direct or indirect--(B) lending of money or other extension of credit between a plan and a disqualified person"), but focuses only on subparagraphs (D) and (E) of section 4975(c)(1). We consider first whether any of the transactions fits under section 4975(c)(1)(D)--"any direct or indirect--(D) transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan".

Petitioner was a disqualified person with respect to the Plan because (1) he was a fiduciary (sec. 4975(e)(2)(A)), (2) he owned Rollins (sec. 4975(e)(2)(E)), and (redundant in the instant case) (3) he owned at least 10 percent of Rollins (sec. 4975(e)(2)(H)). The transactions were uses by petitioner or for petitioner's benefit, of assets of the Plan. These assets of the Plan were not transferred to petitioner. As to each of the transactions before us, petitioner sat on both sides of the table. Petitioner made the decisions to lend the Plan's funds, and petitioner signed the promissory notes on behalf of the Borrowers. This flies in the face of the general thrust of this legislation to stop disqualified persons from dealing with the relevant employees plans or the plans' assets. The Congress replaced prior laws' arm's-length standards and put in their place prohibitions on certain kinds of dealings (with exceptions not relevant to the instant case). The prohibitions were backed up by excise taxes, to be imposed without regard to whether the transactions benefited the employees plans.

However, the Congress chose to carry out this "general thrust" by enacting a series of detailed prohibitions. The question before us at this point is whether petitioner violated one of these detailed prohibitions--direct or indirect use of a plan's assets or income by petitioner or for petitioner's benefit.

From the stipulations and stipulated exhibits we learn that petitioner held the largest interest in each borrower whenever that borrower received a loan from the Plan. Petitioner had an 8.93-percent interest in J & J Charlotte. Petitioner's then-wife had a 6.70-percent interest. Their combined holdings were 2-1/2 times as great as the next-largest holding. Petitioner had a 26.8-percent interest in Eagle Bluff--three times as great as the next-largest holding. Petitioner had a 33.165-percent interest in Jocks and Jills, Inc.--6-1/2 times as great as the next-largest holding.[12] When Eagle Bluff was not able to make its payments to the Plan, petitioner made some of the payments, intending (the parties stipulated) that he would receive his money back when the golf club was sold.

The ERISA '74 conference joint statement of managers states: "this prohibited transaction [use of plan assets for the benefit of a disqualified person] may occur even though there has not been a transfer of money or property between the plan and a party-in-interest [disqualified person]." The statement of managers goes on to illustrate that use of a plan's assets to

---

[12] On brief, petitioner states that his "ownership interest[s] in the entities to which loans were made were roughly 9%, 13% and 24%." Petitioner is correct as to J & J Charlotte. However, his statement on brief substantially conflicts with the parties' stipulations--and the stipulated exhibits--as to Eagle Bluff and Jock and Jills, Inc. Our findings are in accord with the parties' stipulations. Petitioner does not enlighten us as to the source of his statement regarding his ownership interests in Eagle Bluff and Jock and Jills, Inc.

manipulate the price of a security to the advantage of a disqualified person constitutes a prohibited transaction.

In light of the legislative history illustrating the meaning of this statutory provision, it is apparent that the evidentiary record is consistent with a conclusion that petitioner derived a benefit (as significant part owner of each of the Borrowers) from the Borrowers' securing financing without having to deal with independent lenders. That is, it is possible that petitioner derived a benefit. However, it also is possible that petitioner did not derive a benefit. From the evidentiary record herein, we cannot determine which of these possibilities is the more likely one.

When we examine the record for evidence that petitioner did not derive a benefit (e.g., did not receive any money, or did not enhance the values of his investments in the Borrowers), we find nothing.[13]

Petitioner has the burden of proving by a preponderance of the evidence that the loans, or any of them, did not constitute uses of the Plan's income or assets for his own benefit. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Borchers v. Commissioner, 95 T.C. 82, 91 (1990), affd. 943 F.2d 22 (8th Cir.

---

[13] Petitioner's denials on brief are not evidence. Rule 143(b); Evans v. Commissioner, 48 T.C. 704, 709 (1967), affd. 413 F.2d 1047 (9th Cir. 1969).

1991).  On the record before us, petitioner has failed to carry this burden.

Petitioner contends that the loans were good for the Plan, providing diversification and a good return with "safe, secure collateral."  In Leib v. Commissioner, 88 T.C. 1474 (1987), the taxpayer sold stock to the employees' pension trust of the professional corporation that he owned.  The taxpayer contended that the trust's purchase "would qualify as a prudent investment if judged under the highest fiduciary standards."  Id. at 1477. We concluded on that issue as follows:

> After a review of the statutory framework and legislative history of section 4975 and the case law interpreting ERISA section 406, we conclude that the prohibited transactions contained in section 4975(c)(1) are just that.  The fact that the transaction would qualify as a prudent investment when judged under the highest fiduciary standards is of no consequence. Furthermore, the fact that the plan benefits from the transaction is irrelevant.  Good intentions and a pure heart are no defense.  * * *  [Id. at 1481].

Thus, prudence of the investment and actual benefit to the Plan are not sufficient to excuse petitioner from imposition of tax under section 4975(a) if petitioner participated in a prohibited transaction with respect to the Plan.

Respondent directs our attention to O'Malley v. Commissioner, 96 T.C. 644 (1991), affd. 972 F.2d 150 (7th Cir. 1992), in which we held that a transaction violated section 4975(c)(1)(D) even though the taxpayer "did not receive any direct payments from the Plan".  Petitioner correctly points out

that the instant case is distinguishable from O'Malley.  In
O'Malley, the record showed that the plan paid the taxpayer's
legal fees, and the taxpayer did not dispute the Commissioner's
contention that this use of the plan's assets benefited the
taxpayer and thus constituted a prohibited transaction.  O'Malley
v. Commissioner, 96 T.C. at 650.  Petitioner states on brief that
in the instant case "there were no expenses paid by the Plan on
behalf of the Petitioner."  Firstly, petitioner's statement on
brief cannot substitute for petitioner's failure to provide
evidence of record.  Secondly, as the ERISA '74 conference
statement of managers extract shows, even the use of a plan's
assets to enhance the price of a security can constitute a
benefit within the meaning of section 4975(c)(1)(D).  H. Conf.
Rept. 93-1280, supra at 303, 1974-3 C.B. at 469.  The record in
the instant case does not enable us to find that the loans did
not enhance, or were not intended to enhance, the values of
petitioner's equity interests in the Borrowers.

Petitioner contends that Etter v. J. Pease Const. Co., Inc.,
963 F.2d 1005 (7th Cir. 1992), is "a critical case in this area".
The cited Court of Appeals opinion deals with a number of issues.
We assume petitioner intends us to focus on that part of the
Etter opinion dealing with whether an employees plan's investment
in a joint venture "constituted a use of the * * *[employees
plan's] assets for the benefit of a party in interest [in the tax

law, a 'disqualified person'] and, thus, is prohibited by 29 U.S.C. § 1106(a)(1)(D) [sec. 4975(c)(1)(D)]." 963 F.2d at 1010. The Court of Appeals summarized as follows the parties' contentions on that issue, and the Court of Appeals' conclusions, idem.:

> Etter [the plan participant] argues that Pease and Miller [the plan trustees] benefitted from the Plan's investment in that they secured various tax advantages while not risking as much of their personal assets. Conversely, appellees [the plan trustees] argue, as the district court found, that by contributing less than 100% of the purchase price Pease and Miller enabled the Plan to take advantage of a valuable opportunity.

> These two views of the evidence, as different as they may be, are both permissible, and the district court's account is plausible. Therefore, the finding of the district court "cannot be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985).

We agree with petitioner that Etter is significant. The Court of Appeals makes it plain that an employees plan's assets could be used for the benefit of a disqualified person, in violation of section 4975(c)(1)(D), even though none of the employees plan's assets were transferred to the disqualified person. The resolution of the benefit issue depends on whether the party having the burden of proof has carried that burden on the basis of the evidence in the record. Our evaluation of the sparse evidence in the record of the instant case, consistent with Etter, convinces us that petitioner has failed to carry his

burden of proving that he did not use the Plan's assets for his own benefit.

Our conclusion as to section 4975(c)(1)(D) makes it unnecessary for us to determine whether the loans also violated section 4975(c)(1)(E). In particular, we do not decide whether we agree with respondent's contention on brief that petitioner's ownership interests in the Borrowers--

> created a conflict of interest between the Plan and the companies, resulting in dividing his loyalties to these entities. This conflicting interest as a disqualified person who is a fiduciary brought petitioner within the prohibition against dealing "with the income or assets of a plan in his own interest or for his own account". I.R.C. § 4975(c)(1)(E).

We note that the regulation on which respondent relies on this issue--section 54.4975-6(a)(5)(i), Pension Excise Tax Regs.--deals with "the furnishing of office space or a service" and prohibits a fiduciary from causing "a plan to pay an additional fee to such fiduciary* * * to provide a service", and prohibits an arrangement "whereby such fiduciary * * * will receive consideration from a third party in connection with such transaction." None of these elements is suggested on the record herein, and so it is not readily apparent that this regulation is relevant to this issue.

Also, an analysis of the effect of conflict of interest, without more, as a basis of violation of section 4975(c)(1)(E) should take into account the statutory differences between the

ERISA '74 labor law provisions and the tax law provisions. Section 406(b)(1) and (3) of ERISA '74 (codified as 29 U.S.C. 1106(b)(1) and (3)) corresponds to subparagraphs (E) and (F) of section 4975(c)(1). However, the tax law does not have an equivalent of section 406(b)(2) of ERISA '74:

> (b)  A fiduciary with respect to a plan shall not--
>
> *       *       *       *       *       *       *
>
> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries * * *.

The statement of managers, H. Conf. Rept. 93-1280, supra at 309, 1974-3 C.B. at 470, explains this difference between the labor and tax titles as follows:

> In addition, the labor provisions (but not the tax provisions) prohibit a fiduciary from acting in any transaction involving the plan on behalf of a person (or representing a party) whose interests are adverse to the interests of the plan or of its participants or beneficiaries.  This prevents a fiduciary from being put in a position where he has dual loyalties, and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.  (This prohibition is not included in the tax provisions, because of the difficulty in determining an appropriate measure for an excise tax.)

Thus, it appears that a conflict of interest involving a fiduciary's obligations to the other party in a transaction may be actionable under the labor title, but it may be that such a conflict of interest by itself may not be actionable under section 4975(c)(1)(E).

We shall deal with such matters under section 4975(c)(1)(E) when confronted with a record in which we must decide the matters in order to resolve the case.

We hold, for respondent, that each of the loans (<u>supra</u> table 1) constituted a use of the Plan's assets for petitioner's benefit, in violation of section 4975(c)(1)(D).

## II. <u>Failure To File Tax Returns</u>

In the portion of his brief dealing with the additions to tax for failure to file tax returns, petitioner contends that--

> Nothing in this case indicates that there was abuse of any kind to the Plan or its participants, nor was there any economic benefit to the Petitioner himself.  The Petitioner has significant experience in administering and managing benefit plans, and substantial experience in the asset management of plans.  When a taxpayer cannot rely upon the statutory authority itself to support his actions, then the taxing system becomes sheer folly.  * * *  As the record will show, the Petitioner totally relied upon the statutory integrity of the transaction, and to assert there was any abuse or that any assessment of penalties is warranted is an outrage.

Respondent maintains:  (1) Petitioner was obligated to file tax returns for the section 4975(a) taxes; (2) petitioner failed to do so; (3) petitioner did not have reasonable cause for his failure to file tax returns; and (4) such failures result in additions to tax under section 6651(a)(1).

We agree with respondent.

The relevant legal analysis about the application of section 6651(a)(1) to failures to file returns for section 4975 taxes is set forth in Janpol v. Commissioner, 102 T.C. 499 (1994), and need not be repeated here.

Relying on his own understanding of the law, petitioner chose to sit "on both sides of the table in each transaction." Yamamoto v. Commissioner, 73 T.C. 946, 954 (1980), affd. 672 F.2d 924 (9th Cir. 1982). Relying on his own understanding of the law, petitioner did not see any need to file section 4975 tax returns to report any of the transactions. Relying again on his own understanding of the law, petitioner chose to submit the instant case fully stipulated without including evidence to show that he did not benefit from the transactions. In Etter v. J. Pease Const. Co., Inc., 963 F.2d 1005 (7th Cir. 1992), the trustees succeeded in persuading the trial judge that they did not benefit from the employee plan's investment in the joint venture. In the instant case, petitioner failed to persuade the Court that he did not benefit from the transactions.

Petitioner's good-faith belief that he was not required to file tax returns does not constitute reasonable cause under section 6651(a)(1) unless bolstered by advice from competent tax counsel who has been informed of all the relevant facts. Stevens Bros. Foundation, Inc. v. Commissioner, 39 T.C. 93, 133 (1962),

affd. on this point 324 F.2d 633, 646 (8th Cir. 1963).  There is no such evidence in the record in the instant case.

We hold for respondent on this issue.

To take account of the foregoing, including respondent's concessions,

<u>Decision will be entered</u>

<u>under Rule 155</u>.